UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

```
-------------------------------- x
STEFANIE CUNNINGHAM,             :
                                 :
          Plaintiff,             :
                                 :
          v.                     :  Civil No. 3:19-cv-1912(AWT)
                                 :
METLIFE INSURANCE COMPANY,[1] and :
METLIFE GROUP, INC.,             :
                                 :
          Defendants.            :
-------------------------------- x
```

**ORDER RE PARTIAL MOTION TO DISMISS**

For the reasons set forth below, Defendant MetLife Group, Inc.'s Partial Motion to Dismiss (ECF No. 42) is hereby GRANTED. Counts Five and Six of the First Amended Complaint are dismissed.

**Legal Standard**

When deciding a motion to dismiss under Rule 12(b)(6), "the allegations of the complaint should be construed favorably to the pleader." Scheuer v. Rhodes, 416 U.S. 232, 236 (1974). Although a complaint "does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and

---

[1] The court has been informed that the proper defendant is "MetLife Group, Inc." only, and that "MetLife Insurance Company" should not be a defendant. However, the plaintiff requests that the caption not be changed because according to her W-2 statement, she is employed by MetLife Insurance Company and MetLife Group, Inc. See Am. Compl., ECF No. 36, ¶ 10.

1

conclusions, and a formulaic recitation of the elements of a cause of action will not do." Bell Atlantic Corp. v. Twombly, 550 U.S. 550, 555 (2007) (citing Papasan v. Allain, 478 U.S. 265, 286 (1986)) (on a motion to dismiss, courts "are not bound to accept as true a legal conclusion couched as a factual allegation"). "Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Twombly, 550 U.S. at 557). "Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all allegations in the complaint are true (even if doubtful in fact)." Twombly, 550 U.S. at 555 (citations omitted). However, the plaintiff must plead "only enough facts to state a claim to relief that is plausible on its face." Id. at 568. "The function of a motion to dismiss is 'merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof.'" Mytych v. May Dep't Store Co., 34 F. Supp. 2d 130, 131 (D. Conn. 1999) (quoting Ryder Energy Distribution v. Merrill Lynch Commodities, Inc., 748 F.2d 774, 779 (2d Cir. 1984)). "The issue on a motion to dismiss is not whether the plaintiff will prevail, but whether the plaintiff is entitled to offer evidence to support his claims." United States v. Yale New Haven Hosp., 727 F. Supp. 784, 786 (D. Conn. 1990) (citing Scheuer, 416 U.S. at 232).

2

In its review of a motion to dismiss for failure to state a claim, the court may consider "only the facts alleged in the pleadings, documents attached as exhibits or incorporated by reference in the pleadings and matters of which judicial notice may be taken." Samuels v. Air Transp. Local 504, 992 F.2d 12, 15 (2d Cir. 1993). "[I]n some cases, a document not expressly incorporated by reference in the complaint is nevertheless 'integral' to the complaint and, accordingly, a fair object of consideration on a motion to dismiss. A document is integral to the complaint 'where the complaint relies heavily upon its terms and effect.'" Goel v. Bunge, Ltd., 820 F.3d 554, 559 (2d Cir. 2016) (quoting Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002)).

**Count Five: Intentional Infliction of Emotional Distress**

"In order for the plaintiff to prevail [on a claim for intentional infliction of emotional distress], four elements must be established. It must be shown: (1) that the actor intended to inflict emotional distress; or that he knew or should have known that emotional distress was a likely result of his conduct; (2) that the conduct was extreme and outrageous; (3) that the defendant's conduct was the cause of the plaintiff's distress and (4) that the emotional distress sustained by the plaintiff was severe." Petyan v. Ellis, 200 Conn. 243, 253 (1986)(citation omitted.)

3

The defendant contends that the plaintiff has not pled facts that establish the second element, i.e. that the alleged conduct was extreme and outrageous. The court agrees.

"Liability for intentional infliction of emotional distress requires conduct that exceeds all bounds usually tolerated by decent society." Carrol v. Allstate Ins. Co., 262 Conn. 433, 443 (2003). "Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." Id. "In the employment context, . . . routine employment action, even if improperly motivated, does not constitute extreme and outrageous behavior when the employer does not conduct that action in an egregious and oppressive manner." Miner v. Town of Cheshire, 126 F. Supp. 2d 184, 195 (D. Conn. 2000). To be tortious, the conduct must be "atrocious and utterly intolerable." Id.

In Perodeau v. City of Hartford, the court observed, with respect to a claim for intentional infliction of emotional distress based on conduct in the workplace, that employees "reasonably should expect to be subject to other vicissitudes of employment, such as workplace gossip, rivalry, personality conflicts and the like." 259 Conn. 729, 757 (2002).

4

"Whether a defendant's conduct is sufficient to satisfy the requirement that it be extreme and outrageous is initially a question for the court to determine." Appleton v. Bd. of Educ. of Town of Stonington, 254 Conn. 205, 210 (2000).

The defendant denies the plaintiff's factual allegations, but for the purposes of the instant motion, the court must take them as true.

The plaintiff alleges that her supervisor, who is "a biracial African-American," asked her numerous personal questions related to her race, including things such as "are you the lightest one in your family," "what is your hair texture," "how are you black," "what is the race of your parents," whether the plaintiff is Puerto Rican (to which the plaintiff replied that she is African American and that she does not talk about race), about the differences in the texture of her hair and the hair of her sisters, and about her complexion compared to the complexion of her sisters. (Am. Compl., ECF No. 36, ¶ 15, 17, 18). The plaintiff alleges that her supervisor told a story, and made at least one other statement, with sexual innuendo, and that her supervisor shared that she had been a bully in school. See id. at ¶ 23. The plaintiff also alleges that a different employee in another part of the company (i.e., a cafeteria staff member) "looked at the Plaintiff and made the comment 'you are not black enough.'" Id. at ¶ 19. In addition, the plaintiff

5

alleges that her supervisor and two other employees were making fun of the plaintiff, i.e. laughing about her and mocking her, because she asked a stupid question; the comments included "I guess she's not that bright," and "what didn't I get?" Id. at ¶ 34.

The plaintiff further alleges that her supervisor asked the rest of the team how they felt "when Stefanie called them racists," but that the plaintiff never made this statement "as quoted," although she "did say at a prior team meeting that there was a perception of a racial divide in the team." Id. at ¶ 66. The plaintiff alleges that she was told by others that her supervisor made inappropriate comments: "Subsequently on June 8, 2018, at a UA team meeting Ms. Ryan told Plaintiff that Ms. Tringo was talking about her vagina. Specifically, Ms. Tringo was heard to say 'Stefanie does not want to hear about my vagina.'" Id. at ¶ 69.

These factual allegations fall short of establishing conduct that was extreme and outrageous. The plaintiff's factual allegations reflect conduct that is unacceptable in the workplace, but not conduct that rises to the level of being extreme and outrageous. In Savage v. Andoh, the court denied a motion to strike after concluding that whether "a supervisor making anti-Semitic comments to a Jewish employee constitutes extreme and outrageous conduct" is something about which

6

"reasonable people could disagree." No. CV075015657, 2008 WL 1914630, at * 3, 5 (Conn. Super. Ct. Apr. 11, 2008). After reviewing other cases, the court found that "[t]here are . . . several Connecticut cases in which the courts concluded that a supervisor's discriminatory comments to an employee based on the employee's race, religion, or ethnicity, could be considered extreme and outrageous conduct." Id. at *3. The court concluded that "[t]hese cases share as common threads conduct that took place in an employment context, where the tormentor was the employee's supervisor, who made derogatory comments to or about the plaintiff directly corresponding to the plaintiff's race or ethnicity." Id. at *4. For example, in Leone v. New England Communications, the complaint alleged that "the owners of the corporation referred to the plaintiff as 'dago, wop, Father Sarducci or Gimabroni,' that they placed sexually offensive comments and pictures on his computer, that they made comments about his penis, his sexual performance, homosexuality and the like. Such comments were also made to him about others who were employed by his company, those with whom the company had contact or who were customers of the defendant." No. CV010509752S, 2002 WL 1008470, at *3 (Conn. Super. Ct. Oct. 31, 2017). The court found that the conduct was extreme and outrageous. Also, in Gonzalez v. Harte Subuaru, the complaint contained the following allegations:

7

> [T]he plaintiff alleges that Lajoie stated: "You fu* *ing dumb Puerto Ricans, you mother fu* *ers are a bunch of low-lives, no good pieces of shi*, you can't clean the boat you came in. What makes you think you can clean a car?" In April of 2008, the plaintiff alleges that Lajoie stated: "You Puerto Ricans steal everything. There are a bunch of catalytic converters missing. It has to be you guys. If it was up to me, I'd get rid of your guys and hire white guys." In October 2008, in front of several employees, Lajoie allegedly stated to the plaintiff: "Let me fu* * your wife. She has some big fu* *ing tits and she's light skinned. It will feel like I'm fu* *ing a white girl." In November 2008, after inventory had been stolen from Harte, Lajoie allegedly accused the plaintiff of the theft in front of the plaintiff's minor son, stating: "I hope you know I'm going to blame you for the rims you Puerto Rican. You guys are always stealing. Good, now I have a reason to fire you guys."

No. CV106011240S, 2010 WL 4722262 at *1 n.2 (Conn. Super. Ct. Nov. 2, 2010).

Here, while the plaintiff has alleged that her supervisor asked her about matters relating to race, what is missing are allegations showing that any of the questions or comments were derogatory with respect to the plaintiff's race, as opposed to being questions that made the plaintiff uncomfortable because she does not talk about race. To the extent the plaintiff relies on the fact that her coworkers laughed at and mocked her, misquoted her, and talked about her outside her presence, being mocked, being misquoted, and being talked about--all on just several occasions--does not rise to the level of being extreme and outrageous even when these events are considered on a cumulative basis. Nor do they rise to such a level even when

8

taken in combination with the plaintiff's supervisor asking her about matters related to race. Compare Vorvis v. S. New England Tel. Co., 821 F. Supp. 851, 855 (D. Conn. 1993)(the plaintiff suffered "almost every day for a period of over one year, and included chastising, criticism, humiliation in front of coworkers, threats to fire her, extra work assignments for the purpose of causing anxiety, uncompensated work on weekends and evenings, unwarranted vulgar remarks, and disciplinary actions for matters beyond her control.")

### Count Six: Breach of Implied Covenant of Good Faith and Fair Dealing

"[I]t is axiomatic that the . . . duty of good faith and fair dealing is a covenant implied into a contract or a contractual relationship. . . . In other words, every contract carries an implied duty requiring that neither party do anything that will injure the right of the other to receive the benefits of the agreement." Renaissance Mgmt. Co. v. Connecticut Hous. Fin. Auth., 281 Conn. 227, 240 (2007)(citation omitted). "The covenant of good faith and fair dealing presupposes that the terms and purpose of the contract are agreed upon by the parties and that what is in dispute is a party's discretionary application or interpretation of a contract term." Id. "To constitute a breach of [the implied covenant of good faith and fair dealing], the acts by which a defendant allegedly impedes

9

the plaintiff's right to receive benefits that he or she reasonably expected to receive under the contract must have been taken in bad faith." Id.

> [A]n action for breach of the covenant of good faith and fair dealing requires proof of three essential elements, which the plaintiff must duly plead: first, that the plaintiff and the defendant were parties to a contract under which the plaintiff reasonably expected to receive certain benefits; second, that the defendant engaged in conduct that injured the plaintiff's right to receive some or all of those benefits; and third, that when committing the acts by which it injured the plaintiff's right to receive benefits it reasonably expected to receive under the contract, the defendant was acting in bad faith.

Golek v. St. Mary's Hosp., No. CV085007118, 2008 WL 4151328, at *10 (Conn. Super. Ct. Aug. 22, 2008).

The defendant argues that this claim must be dismissed because the plaintiff fails to allege any contractual right with which it allegedly interfered. The court agrees.

In opposition, the plaintiff argues:

> Plaintiff specifically relies on the following aspects of her Amended Complaint in opposition to Defendants' motion to dismiss Count [Six]: Defendants' own equal opportunity and anti-harassment policy; Plaintiff's receipt of raises, bonuses and positive performance reviews and/or Defendants' failure to continue to award same to the Plaintiff; Defendants' promises (and failures) to properly train Plaintiff for STD; Defendants' efforts to depict Plaintiff as "difficult" following the filing of her CHRO complaint; Defendants' reprimands of Ms. Tringo but wholesale failure to take corrective action to ensure the misconduct aimed at Plaintiff did not continue and their inadequate response to have Plaintiff and Ms. Tringo work out their differences; Defendants' failure to promote Plaintiff; Defendants allowed Ms. Tringo to retaliate against Plaintiff for merely doing her job and/or other legally insufficient rationales; Defendants' repeated failure to seriously

10

>address Plaintiff's complaints documenting an unhealthy work environment in violation of Defendants' own policies and applicable law; and Defendants' failure to carry out a proper investigation based on Plaintiff's myriad complaints.

(Pl.'s Mem. of Law in Opp. to Def.'s Partial Mot. to Dismiss, ECF No. 45, at 37-38)(internal citations omitted). However, nowhere in any of this summary does the plaintiff allege facts that could support a conclusion that the defendant interfered with a contractual right.

Finally, the court agrees with the defendant that "[t]o the extent Plaintiff alleges that MetLife violated the implied covenant of good faith and fair dealing inherent in an at-will employment relationship by constructively discharging her on the basis of her race, Plaintiff still fails to state a claim because she admits she remains employed at MetLife. (Compl., ¶ 69 (Plaintiff is on long-term disability leave).) Accordingly, she could not have been constructively discharged." (Partial Mot. to Dismiss, at 5 n.2). See Timbie v. Eli Lilly & Co., No. 3:08CV00979 (PCD), 2010 WL 9067050, at *14 (D. Conn. July 14, 2010) ("Plaintiff has not resigned and is still employed by [d]efendant. . . . As such, [p]laintiff has no claim for relief under a constructive discharge theory . . . ."); Tavoloni v. Mount Sinai Med. Ctr., 98-9640, 1999 U.S. App. LEXIS 24378, at *6 (2d Cir. Oct. 1, 1999) ("Tavoloni is still employed by Mt. Sinai; he has not been discharged, actually or constructively.")

11

It is so ordered.

Dated this 12th day of February 2021, at Hartford, Connecticut.

                                                    /s/ AWT
                                      Alvin W. Thompson
                              United States District Judge